UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>PEDRO SANTACRUZ (1)<br><br>Defendant. | CRIMINAL ACTION NO.<br><br>1:21-CR-304-LMM-JEM-1 |

**UNITED STATES MAGISTRATE JUDGE'S
NON-FINAL REPORT AND RECOMMENDATION**

This criminal case is before the Court on Defendant Pedro Santacruz's motion to suppress the statement he made to law enforcement on June 24, 2021. (Doc. 44). The Court held an evidentiary hearing on Defendant's motion on April 5, 2022. (Doc. 55). Following the hearing, Defendant filed a post-hearing brief in support of his motion, (Doc. 58), the government filed a response, (Doc. 61), and Defendant filed a reply, (Doc. 65). After considering the parties' briefs and listening to the recorded interview, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

**FACTUAL BACKGROUND**

On June 24, 2021, DEA agents executed a federal search warrant at 11 N. Escalada Drive, Nogales, Arizona — a house located about 20 to 25 feet from the border of Mexico where Defendant lived. (Doc. 55 at 8). In Defendant's room, agents found drugs, U.S. currency, a handgun, and a document that agents believed to be a drug ledger. (*Id.* at 10). Agents handcuffed Defendant and placed him in an agent's vehicle, where two DEA agents interviewed him. (*Id.* at 11).

1

One of those agents, DEA Special Agent Grijalva, testified at the evidentiary hearing. (*See* Doc. 55).

SA Grijalva testified that Defendant was cooperative during the course of the interview. (*Id.* at 18). He stated that, at no point did he or the other agent, DEA Special Agent Bellich, threaten Defendant, and he explained that neither agent had their guns drawn during the interview. (*Id.* at 27, 29). Defendant did not appear to be under the influence of drugs or alcohol. (*Id.* at 29). He also appeared to understand the questions he was being asked, and his answers made sense in the context of those questions. (*Id.*).

The interview started with agents reading Defendant his *Miranda* rights. (Doc. 52-1 at 2). Agents read each right, line by line — including Defendant's right to remain silent — and admonished Defendant that anything he said could be used against him in court. (*See* Doc. 52-2; Doc. 52-1 at 2-4). In response, Defendant stated that he understood these rights and signed the waiver of rights form, indicating that understanding. (Doc. 52-2; Doc. 52-1 at 4).

After Defendant acknowledged and waived his *Miranda* rights, he spoke to law enforcement.[1] The interview lasted 34 minutes.[2] (Doc. 55 at Ex. 1). At the interview's start, agents explained that they were at the house because they were investigating drug trafficking, to which Defendant responded that he understood. (Doc. 52-1 at 5). Also near the beginning of the interview, agents explained that, during the search, they "found stuff" and that Defendant had "to

---

[1] While Defendant agreed to speak to law enforcement, he refused to give consent for the agents to search his cell phone. (Doc. 52-1 at 4).

[2] Although the interview transcript notes that the interview duration is "00:01:10," the interview actually lasted 34 minutes and 10 seconds. (*See* Doc. 55 at Ex. 1).

face the consequences for that," but that Defendant could cooperate from here on out as "an opportunity." (*Id.* at 9). When agents asked the open-ended question, "I'm going to let you go ahead and tell us what's going on," Defendant told them that what law enforcement found in his room — that is, the drugs, gun, money, and ledger — belonged to him. (*Id.* at 5). Defendant also admitted to "moving money" by receiving money and then sending it to Mexico. (*Id.* at 7). He explained that the "book" (or ledger) that agents found contained Defendant's notes keeping track of the money he sent to Mexico. (*Id.* at 5). Defendant claimed he never asked whether the money he was retrieving and sending to Mexico constituted drug money, explaining, "I don't ask questions" because "[y]ou know what happens when you have too much to say . . . ." (*Id.* at 9). He further asserted that he did not know who exactly retrieved the money once he sent it to Mexico, but that it was someone with the nicknames "Sir" and "Polly." (*Id.* at 7, 10).

After Defendant provided this information, law enforcement asked him about his co-conspirators' names and what they look like. (*Id.* at 10). When they did so, Defendant said, "I just want this to stay here ok?" (*Id.* at 10). Agent Grijalva responded, "Just so we are on the same page, this doesn't come out . . . doesn't come out, ok. What is discussed here, stays here . . . We're not going to go and . . . you know, it stays here . . . just so you know." (*Id.*). Defendant said, "Ok," and then went on to elaborate on the information he previously provided. Specifically, he explained that "Polly" would instruct him to travel to a store and meet with a particular person; that he would do as instructed; and that, when he met the individual as directed (approximately once every two weeks), that person would give him U.S. currency "wrapped in package form." (*Id.* at 10-11;

3

Doc. 55 at 19). After accepting the money, Defendant explained that he would return to his home, where he would throw the money over the fence separating his house from Mexico, so that the money landed on the ground in Mexico, where someone on that side of the border would retrieve it. (Doc. 52-1 at 11). Defendant also told agents that a 15-year-old boy on a bike sometimes helped transport drugs and money over the border; that the drug trafficking organization used the mail and semi-trucks to transport drugs; and that the semi-trucks carried produce and came from Tucson and Phoenix. (*Id.* at 22-27). Defendant also explained why he kept the money: to keep track of the amount because if "something gets lost I'm told it's my bad." (*Id.* at 15).

After Defendant expounded on his role in the drug trafficking organization, and after agents noted that Defendant seemed "willing to cooperate," Defendant said that he wanted the information he was sharing to "stay between us," because, he explained, he was just the "money type," which meant, he believed, that he faced a lesser "risk" than if he handled the drugs, because he has children. (*Id.* at 19)("I was just the money type . . . you know what I mean, you understand what I'm saying? Because I have kids . . . you know what I'm saying? And, and, I know this is a risk, but, ummm, I don't think the money is that of a bigger risk than the drugs . . . ."). Defendant then stated that "[p]eople are look[ing] at us right now," referring to a drone that, he said, people in Mexico had set up to see what was transpiring on the other side of the border. (*Id.* at 20).

During the interview, Defendant characterized his talking to agents as him "cooperating." (*Id.* at 16)("I've been cooperating ok . . . ."). He also told agents that, had they approached him sooner, his cooperation could have been more

helpful. For example, Defendant stated: "If you would have come to me directly and said . . . you know what man, I have all this against you and all that . . . I want your cooperation? You could have been have had more . . . more people." (*Id.* at 8). Defendant also said, "And also, like I was telling you man . . . If you guys would of stopped me down there and prevent all this . . . it would have been a different story," elaborating that, "you could of gotten more people." (*Id.* at 17). He further explained that if the agents hadn't arrested him "on the street," he could have been cooperative "in a different way" by "deliver[ing] more." (*Id.* at 17). Defendant also emphasized, "If I were on the outside . . . I could help you more." (*Id.* at 32).

In response to Defendant's statements that his cooperation would have been more fruitful if law enforcement had approached him earlier, agents assured him that he could still cooperate and provide important information for the investigation. (*Id.* at 17). The agents repeatedly explained that they were trying to understand "the whole picture" of how the drug trafficking organization worked. (*See id.* at 8 ("We know it starts in Mexico and it probably goes all the way up the east coast . . . right?"); *id.* at 17 ("I know it doesn't stop here in AZ, obviously, money is coming back but we know something is going on . . . ."); *id.* at 19 ("How does it work[?]"); *id.* at 19 ("So we just want you to be honest, truthful and then also, the whole picture"); *id.* at 20 ("The whole thing. So, that's why we are asking. So, what we know now and our experience in other states. That's why we are asking what you, how you know how it works in AZ and other states like Texas, you know what I mean . . . or where the people you talking to may be? There are people in other offices that can help us."); *id.* at 31 ("[W]e want the full picture.")).

5

At the end of the interview (on page 32 of the 36-page transcript), Defendant said, "I want to ask respectfully . . . if I were willing to talk more about that . . . I need something on paper, you know what I mean . . . ?" (Id. at 32). In response, agents explained the following:

- "We can't promise that . . . we just can't do it," (Id. at 32);

- "It's hard, it's not, it's not our decision to make, so attorneys, judges are the ones who are able to make this decision or discussion . . . for example, you talk, we talk, we get the information . . . that get[s] relayed to prosecutors and judges and that gets factored in to see what happens," to which Defendant responded, "Ok." (Id.); and

- "The judge is going to factor that in . . . again . . . that doesn't mean it helps that doesn't mean it hurts . . . We can't promise a damn thing," (Id.).

Finally, when Defendant asked again about cooperating, the following exchange took place:

| Speaker | |
|---|---|
| SA Ballich | . . . What we talk about now, it's going to help you because it's gonna be relayed |
| Defendant | But I been very helpful already? |
| SA Grijalva | And, yea, yea, you've been helping and just so again, we are going to clarify it . . . this doesn't get out. Cause I know for your protection that what you need . . . and with your kids . . . |
| Defendant | Yea, yea . . . |
| SA Grijalva | It won't be leaked, it won't be leaked,[3] ok, we understand that part . . . ok |
| Defendant | Yea, I just want you to, to acknowledge, you know what I mean, that I've been helpful and . . . you know what I mean . . . |

---

[3] During the evidentiary hearing, Agent Grijalva explained that, when he told Defendant that Defendant's statements would not be "leaked," he meant that the agents would not tell members of the drug trafficking organization that Defendant was cooperating. (Doc. 55 at 44).

| SA Grijalva | Oh, yea, yea . . . I know |
|---|---|
| SA Ballich | Again, I wish it was up to us to decide to what level, but again that's out of our . . . the attorneys are the ones who can come and say want more. So, just so you are clear, we can't promise anything, we can't say, you know . . . one things equals something of help does that make sense? |
| Defendant | Yea, yea, yea . . . |
| SA Ballich | Yea, you know a name doesn't necessarily equal something in return . . . this doesn't get you this . . .<br>We are trying to get the whole picture so we can say: hey, this is what we were able to accomplish together . . . and the attorneys and judges can make up their minds as to what they are going to decide . . . |
| Defendant | Ummmm, how can I say this? I don't want this conversation to vanish, like uugh . . you understand what I'm saying . . . ? I don't want this to be like you guys to act like I didn't cooperate, you understand what I'm saying?<br>. . . |
| SA Ballich | We will tell the attorneys like, hey listen . . . we talked, you were cooperative, truthful, respectful and all that, that's going to factor in . . . what they're going in turn do is say, what can he do for this case then . . .<br>. . .<br>All we can tell you is what I can tell you is that this information will be relayed back to the attorneys and how they deal with it . . . that's out of our hands.<br>. . . |
| Defendant | Ok. If something comes to mind I'll let you know. |

(*Id.* at 33-35).

Defendant was subsequently arrested and ultimately signed up as a confidential informant. (Doc. 55 at 28, 32).

7

## ANALYSIS

Defendant argues that his statements to law enforcement should be suppressed because they were not freely and voluntarily made. (Doc. 58 at 3). Specifically, he asserts that, because agents told Defendant that they would not "leak" what Defendant told them, their initial *Miranda* warning to Santacruz that anything he said could be used against him amounted to a misrepresentation of law. (Doc. 58 at 12). Because of that, Defendant argues, his statements should be suppressed. (Doc. 58 at 12).

### A. Case Law

To be sure, the Eleventh Circuit holds that law enforcement's misrepresentations of law may render a suspect's confession involuntary. Three main cases — *Hart v. Attorney General of Florida*, 323 F.3d 884 (11th Cir. 2003), *United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010), and *United States v. Castor*, 598 F. App'x 700 (11th Cir. 2015) — apply this holding.

First, the Eleventh Circuit recognized this principle in *Hart v. Attorney General of Florida*, 323 F.3d 884 (11th Cir. 2003). In that case, while the defendant was being questioned, but after he was read his *Miranda* rights, he asked whether he should hire a lwyer. *Id.* at 894. Law enforcement responded that a lawyer would simply tell the defendant not to answer incriminating questions, and further told the defendant that "honesty wouldn't hurt him." *Id.* The Eleventh Circuit held that this latter statement "contradicted the *Miranda* warning previously given, noting that the phrase "honesty will not hurt you" is simply not compatible with the phrase "anything you say can be used against you in court." *Id.* By contradicting the *Miranda* warning, the officer misled the defendant about the consequences of relinquishing his right to remain silent. *Id.*

Consequently, the defendant's decision to waive his rights and confess was the product of the officer's deception, thus rendering the defendant's waiver involuntary and his statements inadmissible. *Id.*

The Court reiterated this principle seven years later, in *United States v. Lall*, 607 F.3d 1277, 1281 (11th Cir. 2010). In *Lall*, law enforcement was investigating an armed robbery that occurred at a house where 20-year-old Lall lived with his parents and siblings. The responding detective explained that he wanted to learn the robbers' motive to commit the crime, and that any information Lall shared with the police in helping them investigate the armed robbery would not be used to prosecute him. *Id.* Relying on that promise, the defendant showed the detective a room in the house containing equipment he used to commit identity theft. *Id.* Several days later, the detective asked Lall to come to the police station for another interview, and, in doing so, reassured Lall's father that Lall did not need a lawyer because the detective "wasn't going to be charging him with any of this." *Id.* Unbeknownst to the family, though, the detective had already relayed the identity-fraud evidence to the Secret Service. *Id.* at 1282. Ultimately, a federal prosecution charged Lall with credit card fraud and identity theft. *Id.* The *Lall* Court held that the defendant "did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it," and thus did not make a "voluntary, knowing, and intelligent waiver of his privilege against self-incrimination." *Id.* at 1284.

After *Lall*, the Eleventh Circuit decided, in an unpublished decision, *United States v. Castor*, 598 F. App'x 700 (11th Cir. 2015). In that case, the defendant spoke to law enforcement only after the officer stated that he would not charge the defendant with drug offenses. *Id.* at 703. After the defendant admitted that he

9

had marijuana, law enforcement secured a search warrant, searched the defendant's house, and seized marijuana, cocaine, and a firearm. *Id.* at 701. The Court held that the defendant's decision to waive his rights and confess was the product of the officer's deception, thus rendering the defendant's *Miranda* waiver involuntary, his statements inadmissible, and the seized evidence suppressed as fruit of the poisonous tree. *Id.* at 703.

Simply put, all three cases "essentially rely on the premise that when an officer deceptively promises non-prosecution, it is 'impossible for the defendant to make a *rational* choice as to whether to confess.'" *United States v. Grant*, No. 5:19-CR-154, 2019 WL 5068530, at *5 (N.D. Ala. Aug. 16, 2019)(quoting *Lall*, 323 F.3d at 894)(emphasis in original).

### B. Applying the Law to the Facts Here

*Lall* spells out the test that a court must employ when faced with the challenge that Defendant brings here. As the Court explained, Lall's challenge — as does Defendant's challenge here— "encompasses two separate yet interrelated arguments: (1) that the officer's promises of non-prosecution prevented the defendant from making a voluntary, knowing, and intelligent waiver of his *Miranda* rights; and (2) that these promises rendered any subsequent confessions involuntary and thus inadmissible." *Lall*, 607 F.3d at 1282.

With respect to the first argument — whether the waiver of the privilege against self-incrimination was voluntary, knowing, and intelligent — the Court must consider two factors: (1) whether the relinquishment of the rights was voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion or deception; and (2) whether the waiver was made with a full awareness of both the nature of the right being abandoned and the

consequences of the decision to abandon it. *Id.* at 1283 (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

Regarding the second argument, while a failure to comply with *Miranda* creates the presumption that a confession was not voluntary, the Court must still examine whether the confession was voluntarily given. *Id.* at 1285. The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary. *Id.* Whether a statement was voluntarily given must be examined in light of the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "The totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of an essentially free and unconstrainted choice." *United States v. Hutchinson*, No. 1:12-CR-409, 2013 WL 3938541, at *11 (N.D. Ga. July 30, 2013). In order for a defendant to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police conduct, and it is essential that there is a link between the coercive conduct of the police and the confession of the defendant. *Colorado v. Connelly*, 479 U.S. 157, 163-65 (1986).

The Court's inquiry thus boils down to one essential question: were Defendant's statements the product of "a free and deliberate choice" or "the result of deception"? *Bradley v. Nagle*, 212 F.3d 559, 565 (11th Cir. 2000); *see also United States v. Grant*, No. 5:19-CR-154, 2019 WL 5068530, at *4 (N.D. Ala. Aug. 16, 2019)(while acknowledging that the officer's statement provided "some basis" under which the defendant could have concluded that his statement would not be used against him, ultimately explaining: "All that said, regardless of whether coercion was present, the ultimate question is 'whether, under all of the surrounding circumstances, the statement was the product of the accused's

11

free and rational choice.'"). After listening to the taped recording of the interview, I find that Defendant's statements were the product of his own free will.

To begin, Defendant appeared to understand his *Miranda* rights when he decided to waive them at the beginning of the interview. Throughout the interview, the agents were cordial and conversational, as was Defendant; indeed, the entire interview was a back-and-forth of respectful discussions. The agents did not have their guns drawn, and the interview lasted only 34 minutes. There is no indication that Defendant did not understand his *Miranda* rights, each of which he acknowledged. In short, Defendant did not appear to be in any distress when he waived his *Miranda* rights and that he did so knowingly.[4]

But the main issue here is whether Defendant believed that his statements were not going to be used against him.[5] While agents told Defendant, "[T]his doesn't come out . . . [w]hat is discussed here stays here," (Doc. 52-1 at 10), and "[I]t won't be leaked," (Doc. 52-1 at 33), these statements are qualitatively different from the statements made in *Hart* (telling the defendant that honesty wouldn't hurt him), *Lall* (stating that the officer was not going to pursue any

---

[4] Further buttressing this finding is the fact that Defendant did not consent to have his cell phone searched. He exercised his rights in refusing to consent to that search, suggesting that, had he wanted to, he would have exercised his right to remain silent as well.

[5] "Although proving a voluntary, knowing, and intelligent waiver "entails the proving of a person's subjective statement of mind," the court relies on the "objective indicia of a defendant's state of mind." *United States v. Grant*, No. 5:19-CR-154, 2019 WL 5068530, at *4 (N.D. Ala. Aug. 16, 2019)(quoting *United States v. Sonderup*, 639 F.2d 294, 297 (5th Cir. 1981)). Thus, this Court may look at what was objectively said to help it determine Defendant's subjective state of mind.

charges against the defendant), and *Castor* (stating that the officer would not charge the defendant with a criminal offense). The "only plausible interpretation" of the officers' representations in those cases, "semantic technicalities aside," was that the information the defendants provided would not be used against them by the officers or anyone else. 607 F.3d at 1287. In contrast here, the agents' statements were not express assurances of immunity. In fact, they were the exact opposite. The agents — repeatedly — told Defendant that what happened next was "out of our hands" and that they had no power over the case going forward, once they passed along Defendant's statements to the "attorneys" and "judges." (Doc. 52-1 at 32-35). Further, the agents expressly told Defendant, at the start of the interview, that he was going to have to "face the consequences" for the drugs, gun, and drug ledger he had in his room. (Doc. 52-1 at 9). "Facing the consequences" is the exact opposite of an express assurance of immunity. *See United States v. Cordova*, 829 F. Supp. 2d 1342, 1356 (N.D. Ga. Nov. 3, 2011)(district judge finding that, an officer's statements that he would "keep this all on the hush-hush as long as you cooperate with me . . . I'll keep it quiet" were "not the equivalent of the express assurance of immunity that the officer gave the defendant in *Lall*.").

In addition, context matters. "The Court may not view snippets of an encounter in isolation but must instead assess the voluntariness of a statement under the totality of the circumstances." *United States v. Hutchinson*, No. 1:12-CR-409, 2013 WL 3938541, at *9 (N.D. Ga. July 30, 2013)(rejecting the defendant's argument that law enforcement's statements negated the prior *Miranda* warnings, and, in doing so, rejecting the defendant's invitation for the Court to look at law enforcement's statements "in a vacuum, unbridled by

13

context."). The context here shows that agents explained that it was Defendant's cooperation that would not be leaked, *not* that Defendant wouldn't be prosecuted at all. The context further shows that Defendant understood what the agents were saying. As stated above, agents began the interview by explaining that Defendant had to "face the consequences" for the drugs, gun, money, and ledger, but that Defendant could cooperate from here on out as "an opportunity." (*Id.* at 9). And with respect to cooperating, Defendant's statements throughout the interview made three things clear: (1) by talking to law enforcement, he believed he was "cooperating" with them; (2) he did not want the agents to forget that he had, in fact, cooperated; and (3) he wanted to be rewarded for that cooperation. (*See id.* at 16)(stating, "I've been cooperating ok"); *id.* at 33 (stating, "But I been very helpful already?"); *id.* at 31 (stating that, if he was going to continue to cooperate, he wanted "something on paper"); *id.* at 33 (stating, "I just want you to, to acknowledge, you know what I mean, that I've been helpful"); *id.* at 34 ("I don't want this conversation to vanish . . . you understand what I'm saying?")).

In response to these statements, agents made their own selves clear: while they welcomed Defendant's cooperation, they had no control over what would ultimately happen to Defendant's case. (*See, e.g., id.* at 35)(responding, "All we can tell you is that this information will be relayed back to the attorneys"); *id.* at 32 (explaining that the defendant's cooperation will "get factored in to what happens next."); *id.* at 33 (lamenting, "I wish it were up to us to decide."); *id.* at 32 (stressing, "We can't promise a damn thing.").

And each time that law enforcement told Defendant that the judges and attorneys controlled the case, Defendant neither objected nor asked any

14

questions. (*See, e.g., id*. at 32)(responding, "Ok," after agents explained that his cooperation "gets factored in to see what happens next."). Instead, Defendant continued in his requests for reassurance that his cooperation would not be forgotten. (*See id.* at 33-34).

The context also supports SA Grijalva's testimony at the hearing that, when he assured Defendant that his statements "wouldn't be leaked," SA Grijalva meant that law enforcement would not tell the drug trafficking organization that Defendant was cooperating. While Defendant now argues that he was not fearful of the drug trafficking organization, the record shows that Defendant first asked that his statements "stay here" only after the agents probed further into the specific identifying characteristics of the drug traffickers — their names and what they looked like — supporting the conclusion that Defendant was, in fact, fearful. (*Id*. at 10). Defendant's statement as to his role in the organization also shows someone who does not want to get on the wrong side of a criminal organization: Defendant said that he doesn't ask questions because "you know what happens when" you do, and explained that he moves money (not drugs) for the organization because he has children and believes that handling money is less "risky." (*Id*. at 9, 19). And when SA Grijalva said, "This doesn't get out" because you need "protection," Defendant simply responded, "Yea, yea." (*Id*. at 33). These interactions show that both parties understood that what wasn't going to "be leaked" was Defendant's cooperation.

Finally, the interview's chronology is telling. In examining the totality of the circumstances, this Court must assess whether law enforcement's conduct was "causally related to the confession." *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994)). In other words, "[t]here must be some causal connection

15

between law enforcement conduct and the confession." *Id.* While Defendant argues that it was "[o]nly after the agents promised to not divulge [what the defendant said], did Santacruz convey the meaningful and substantive inculpatory information expressed in reliance on that promise not to disclose," the record does not bear this out. Instead, the record shows that Defendant's statements both before and after he was told that his comments "stay here" were not appreciably different. Specifically, before Defendant asked law enforcement if his answers would "stay here," he had already told them that the drugs, gun, money, and ledger belonged to him, and that his job was to "move money" from the United States to Mexico. (Doc. 52-1 at 5-7). He explained that the ledger were his notes for keeping track of the money that he moved. (*Id.*). His responses after the contested representation simply spelled out in more detail what he had already disclosed. Theses subsequent statements elaborated on how the drug trafficking organization worked (i.e., that he would receive a telephone call during which he would be told were to go to retrieve the money; that he would meet individuals at a store; and that he would return to his house and throw the money over the fence, where it landed in Mexico). *See United States v. Grant*, No. 5:19-CR-154, 2019 WL 5068530 (N.D. Ala. Aug. 16, 2019)(noting that the defendant's responses to law enforcement's questions "were not appreciably different following the threat than they had been prior to it," in contrast to *Hart* and *Lall*, where the defendants' full confessions followed the misrepresentations to the defendants."). Under the totality of the circumstances, then, the undersigned cannot find that Defendant's will was overborne by a promise that his statements would not be used against him.

## CONCLUSION

For the reasons explained above, I **RECOMMEND** that Pedro Santacruz's Motion to Suppress Statements be **DENIED**. (Doc. 44). Defendant has no further motions pending before me. Accordingly, his case is **CERTIFIED READY FOR TRIAL**.

**SO RECOMMENDED** this 22nd day of July, 2022.

_____
J. ELIZABETH McBATH
UNITED STATES MAGISTRATE JUDGE